USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-1597 CARIBBEAN PETROLEUM CORPORATION, Petitioner, v. UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent. ____________________ ON PETITION FOR REVIEW OF AN ORDER OF THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY ____________________ Before Selya and Cyr, Circuit Judges, ______________ and Pettine,* Senior District Judge. _____________________ ____________________ Karin G. Diaz-Toro, with whom Goldman, Antonetti & Cordova was on __________________ ____________________________ brief for petitioner. Alan D. Greenberg, Attorney, with whom Lois J. Schiffer, Acting __________________ ________________ Assistant Attorney General, Randolph L. Hill, Attorney, and Meyer _________________ _____ Scolnick, Assistant Regional Counsel, were on brief for respondent. ________ ____________________ July 7, 1994 ____________________ ____________________ *Of the District of Rhode Island, sitting by designation. CYR, Circuit Judge. Petitioner Caribbean Petroleum CYR, Circuit Judge. _____________ Corporation challenges the discharge permit it was issued by the United States Environmental Protection Agency (EPA) under the Clean Water Act. Relying on our recent opinion in Puerto Rico ___________ Sun Oil Co. v. United States EPA, 8 F.3d 73 (1st Cir. 1993), ___________ __________________ Caribbean contends that EPA acted arbitrarily and capriciously by incorporating a water quality certification issued by the Envi- ronmental Quality Board of the Commonwealth of Puerto Rico (EQB) which was still undergoing review by the EQB. Finding no error, we deny the petition for review. I I BACKGROUND BACKGROUND __________ We had occasion, in Puerto Rico Sun Oil, to survey the ____________________ regulatory framework controlling the present appeal: The Clean Water Act, 33 U.S.C. 1251, et seq., prohibits the discharge into pro- _______ tected waters of any pollutant by any person, id. 1311(a), unless a discharge permit has ___ been secured from EPA. Id. 1342. The ___ permitting regime is a hybrid one in which both EPA and the counterpart state agency play a role. The precise role depends on whether EPA has delegated permit issuing authority to the state; but no such delega- tion is present here. Puerto Rico is treated as a state for purposes of the Clean Water Act, id. 1362(3), and its local agency is ___ the Environmental Quality Board. 2 To obtain a permit, the applicant must satisfy a variety of substantive requirements under the Clean Water Act but, in addition, no EPA permit can issue unless the state in which the discharge will occur gives its own approval (called "certification") or waives its right to do so. 33 U.S.C. 1341(a)(1). Further, the state certification may impose discharge limitations or requirements more stringent than federal law requires, and those more stringent obligations are incorpo- rated into the federal permit as a matter of course. See generally United States v. Mara- ___ _________ _____________ _____ thon Development Corp., 867 F.2d 96, 99 (1st ______________________ Cir. 1989) (describing state role). Id. at 74-75. ___ Petitioner Caribbean discharges a large volume of process and storm water from its Bayamon, Puerto Rico, refining facility into Las Lajas Creek, a protected waterway designated by EQB as a drinking water source. Caribbean has been regulated under the Clean Water Act National Pollution Discharge Elimina- tion System (NPDES) at its Bayamon operation since it was issued a five-year permit in 1983. The present controversy surfaced during the NPDES renewal process, which proceeded as follows: 10/27/88 Caribbean files NPDES renewal 10/27/88 application with EPA. 11/10/88 EPA requests EQB certification. 11/10/88 02/01/89 EQB issues draft certification, 02/01/89 instructing EPA that it "shall be incorporated into [Caribbean's] NPDES permit." 04/07/89 Caribbean submits comments to EQB 04/07/89 on draft certification, contending that its pollutant concentration standards are unreasonable, impractical, and unfeasible. 3 05/10/89 EQB issues (substantially 05/10/89 ___ ______ unmodified) final certification. _____ _____________ 06/30/89 Caribbean requests EQB 06/30/89 reconsideration of certification issued 5/10/89. 08/07/89 EPA issues draft NPDES to Caribbean 08/07/89 incorporating the 5/10/89 final certification. 09/06/89 EPA receives comments on draft 09/06/89 NPDES from Caribbean. 10/13/89 EQB notifies EPA that it is 10/13/89 ___ ________ ___ ____ __ __ reviewing the 5/10/89 certification _________ ___ _______ _____________ and requests that EPA delay is- suance of final NPDES pending re- view. 09/28/90 EPA issues final NPDES, incorpora- 09/28/90 ting 5/10/89 certification. At the time the final NPDES was issued on September 28, 1990, EPA considered the May 10, 1989 certification appropriate for incorporation into the final NPDES because EQB had never stayed its certification and it therefore remained in effect as a matter of law. Now, more than five years later, EQB has yet to act on Caribbean's request for reconsideration of the "final" certification issued May 10, 1989. II II DISCUSSION DISCUSSION __________ Caribbean attempts to rest its challenge to the final NPDES on the coattails of Puerto Rico Sun Oil, by posing the same ___________________ generic question involved there: Is it arbitrary and capricious 4 for EPA to incorporate a water quality certification into a final NPDES while the certification ostensibly is undergoing review by the local agency? In Puerto Rico Sun Oil, we held that there was ___________________ no procedural bar to the incorporation of an EQB certification __________ which had not been stayed until after the final NPDES issued. Id. at 77. In a similar vein, we perceive no serious procedural ___ obstacle in the present case.1 We went on to hold, neverthe- less, that in the circumstances presented in Puerto Rico Sun Oil, ___________________ EPA's decision "made no sense," and amounted to arbitrary and capricious agency action absent explanation. Id. By contrast, ___ however, here the only colorable rationality claim raised by Caribbean rests on a far less substantial basis. "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n __________________________ v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983). Agency _____________________________ actions are not to be set aside as arbitrary and capricious, see ___ Administrative Procedure Act, 5 U.S.C. 706(2)(a), unless they ____________________ 1Caribbean raises two lackluster procedural claims which warrant but brief consideration. First, a request from the local certifying agency that EPA delay issuance of its NPDES pending reconsideration of the local agency certification is not the equivalent of a formal stay suspending the legal effect of the certification, such as EPA issued in the Puerto Rico Sun Oil ____________________ proceedings, see Puerto Rico Sun Oil, 8 F.3d at 80. Second, ___ ____________________ since the original certification was never stayed, EPA was not obliged to resort to the procedures in 40 C.F.R. 122.44(d)(3) to compel EQB either to issue a new certification within 60 days or waive certification. See Puerto Rico Sun Oil, 8 F.3d at 80. ___ ___________________ 5 lack a rational basis. See, e.g., Rhode Island Higher Educ. ___ ____ __________________________ Assistance Auth. v. Department of Educ., 929 F.2d 844, 855 (1st ________________ ___________________ Cir. 1991). Like other executive agencies acting within their respective bailiwicks, EPA is due substantial deference in interpreting and implementing the Clean Water Act -- "so long as [its] decisions do not collide directly with substantive statuto- ry commands and so long as procedural corners are squarely turned." Puerto Rico Sun Oil, 8 F.3d at 77; see generally Chevron ___________________ ___ _________ _______ U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 843 ______ __________________________________ (1984). We therefore inquire whether, in the vernacular of Puerto Rico Sun Oil, the challenged EPA action its issuance of ___________________ a final NPDES notwithstanding EQB's request that EPA forestall its processes in anticipation of further action on Caribbean's request for review of the EQB certification makes sense. First, surface appearances aside, several factors plainly reflect that this case is not of a feather with Puerto ______ Rico Sun Oil. Not least important is the fact that EPA delayed ____________ its issuance of the Caribbean NPDES for almost a year at EQB's ______ _ ____ request; whereas in Puerto Rico Sun Oil EPA incorporated the EQB ____________________ certification within two weeks after learning that the ___ _____ certification was being reconsidered by EQB. Thus, whereas the timing of the EPA action in Puerto Rico Sun Oil lent to the ____________________ impression that an administrative trap had been hastily snapped shut, there is nothing in the present record to indicate that the 6 eleven and one-half month period EPA afforded EQB to review its certification was either unreasonable or arbitrary. Second, the significance of the timing of the EPA action in Puerto Rico Sun Oil was magnified by a substantive _____________________ Clean Water Act monitoring issue not implicated in these proceed- ings. As a consequence of EPA's precipitous action, the permit- tee in Puerto Rico Sun Oil was left to cope with a monitoring ____________________ methodology unequivocally disavowed by EQB.2 We found that this whipsaw certification procedure "made no sense." Puerto Rico Sun _______________ Oil, 8 F.3d at 77.3 ___ ____________________ 2The late 1980s witnessed an abortive effort by EQB to alter its water quality monitoring methodology. For many years EQB Water Quality Standards had used a "mixing zone" method, which calls for pollutant concentrations to be measured in the protect- ed waters into which the permitted discharge occurs. In 1989, however, EQB issued a draft document that adopted an "end-of- pipe" (or effluent) approach, whereby pollutant concentrations are measured at the discharge source, prior to dilution in the receiving waters. Although this draft document was withdrawn in 1990, the permittee in Puerto Rico Sun Oil had been certified ____________________ during the brief reign of the new "effluent monitoring" policy, and this (presumably more exacting) monitoring methodology had been written into the certification EQB provided EPA. 3"EQB had used a mixing zone analysis in the past and was proposing to do so in the future . . . . Yet just as [Sun Oil] moved to correct the EQB certification, EPA moved even more swiftly to adopt a final permit based on the EQB certificate that omitted a mixing zone analysis." Puerto Rico Sun Oil, 8 F.3d at ____________________ 76. In sharp contrast, no such ambivalent EQB monitoring method- ology was at work in this case. Effluent monitoring, see supra ___ _____ note 2, was the pre-1990 baseline for Caribbean, which, unlike the permittee in Puerto Rico Sun Oil, discharges into a designat- ___________________ ed drinking water source. This much is clear from the face of the 1983 permit: "Samples taken in compliance with the monitoring requirements set out above shall be taken at the outfall . . . prior to discharge to Las Lajas Creek." Additionally, 7 Third, at no time did EQB stay its Caribbean certifica- tion. In Puerto Rico Sun Oil, however, EQB issued a formal stay, ___________________ albeit after EPA had issued its NPDES incorporating the certifi- cation. Although this court held that the ex post EQB stay was __ ____ ineffective, as a matter of procedure under the Clean Water Act, id. at 80 ("We agree with EPA that the [post-NPDES issuance] ___ decision of EQB to re-characterize its certification order as non-final cannot affect the procedural validity of EPA's decision to grant the permit."), the fact remains that EQB, by staying the certification in Puerto Rico Sun Oil, took far more timely and ____________________ definitive action than was ever taken during the eleven and one- half months (not to mention the ensuing four years) that EPA awaited EQB's promised review of the Caribbean certification. Finally, moving beyond the precedential shadow cast by Puerto Rico Sun Oil, Caribbean has not identified (nor can we) ____________________ any other potential manifestation of arbitrary and capricious agency conduct on EPA's part. Rather, our review evinces reason- able agency adherence to appropriate procedures and reasonable ____________________ Caribbean's April 7, 1989, comments on EQB's draft certification requested "interim effluent standards," a further indication that ________ the substantive standards contained in the certification, not the monitoring methodology, were driving the conflict between Carib- bean and EQB. In sum, there is no evidence that the EQB certifi- cation issued to Caribbean was the product of a bureaucratic snafu such as infected the permitting process in Puerto Rico Sun _______________ Oil, 8 F.3d at 76 (noting that EQB's certification "must have ___ appeared a probable candidate for administrative or judicial revision" as it incorporated effluent standards that had already been abandoned). 8 accommodation of Caribbean's legitimate interests. We note as a significant further consideration that should EQB issue Caribbean a revised certification, EPA may amend its NPDES. See 40 C.F.R. ___ 124.55(b); Puerto Rico Sun Oil, 8 F.3d at 80.4 The availability ___________________ of contingency procedures for considering post-issuance modifications to EQB's certification further reduces the like- lihood of "arbitrary" EPA action in these circumstances. III III CONCLUSION CONCLUSION __________ Our conclusion that the challenged EPA action was not "arbitrary and capricious" is firmly rooted in the record evi- dence that (1) EPA stayed its hand for more than eleven months to permit EQB to reconsider its Caribbean certification; (2) yet EQB neither issued a new certification, nor stayed its original cert- ification; and (3) the EQB certification incorporated in the NPDES essentially comported with the effluent monitoring policy to which Caribbean had been subject ever since it was first permitted under the Clean Water Act. We decline to visit on EPA ____________________ 4We need not address the complex issue as to whether any such changes to Caribbean's NPDES would run afoul of the Clean Water Act "anti-backsliding" provisions. See 33 U.S.C. 1342(o). ___ We do note, however, that EPA represents that anti-backsliding is "unlikely to be an issue in this case" because the modification of a NPDES to reflect changes in the local agency certification likely would come within one of several exceptions to section 1342(o). See 33 U.S.C. 1342(o)(2) (prescribing five exceptions ___ to section 1342(o)). 9 the responsibility for unexplained, if not inexplicable, EQB delays in undertaking or completing its promised reconsideration, nor to compromise in the meantime the important public interests served by the Clean Water Act. The petition for review is denied. denied ______ 10