USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 97-1834 ACTION FOR BOSTON COMMUNITY DEVELOPMENT, INC., Plaintiff, Appellant, v. DONNA E. SHALALA, AS SHE IS THE SECRETARY OF THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, AND THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, ADMINISTRATION FOR CHILDREN, AND FAMILIES, REGION I, Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Robert E. Keeton, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Boudin, Circuit Judge, _____________ and Woodlock,* District Judge. ______________ ____________________ Janet Steckel Lundberg with whom Richard M. Bluestein, Krokidas & ______________________ ____________________ __________ Bluestein, Garrick F. Cole and Smith & Duggan were on brief for _________ ________________ _______________ appellant. David S. Mackey, Assistant United States Attorney, with whom ________________ Donald K. Stern, United States Attorney, was on brief for the United _______________ States. ____________________ February 9, 1998 ____________________  ____________________ *Of the District of Massachusetts, sitting by designation. BOUDIN, Circuit Judge. In form, this appeal seeks ______________ review of the district court's refusal to grant injunctive relief to the plaintiff, Action for Boston Community Development ("ABCD"), a major provider of Head Start services in Boston. In substance, this is an administrative review proceeding by which ABCD seeks to overturn the decision by the Department of Health and Human Services ("HHS") to select a different grantee to receive funds for a new Head Start project in Boston. The pertinent facts are undisputed. The Head Start program is designed to deliver social services to economically disadvantaged children and their families. 42 U.S.C. 9831. To provide such services, HHS makes grants to private entities, like ABCD. ABCD is a longstanding Head Start grantee in Boston, responsible for a number of diverse programs, and it tells us that in a recent year its grants exceeded $20 million. From 1982 to 1995, the year it lost its funding, Esquelita Aquebana, Inc. operated a Head Start program in a Boston area known as Uphams Corner, comprising a portion of Roxbury, Dorchester and the South End of Boston. In January 1996, HHS announced that a grant would be made to a replacement provider of services in Uphams Corner in an amount somewhat exceeding $500,000. Two of the three applicants for the funds were ABCD and Dimmock Community Health Center ("Dimmock"). -2- -2- For many years, Congress has provided that HHS must give "priority" to Head Start agencies which were receiving Head Start funds on August 13, 1981, "unless [in the current phrasing] the Secretary makes a finding that the agency involved fails to meet program, financial management, and other requirements established by the Secretary." 42 U.S.C. 9836(c)(1). HHS apparently took no account of this priority since its announcement said that the funding was "to be competitively awarded." In any case, HHS established an independent panel to review the applicants and on May 13, 1996, the panel awarded ABCD 419 points; Dimmock, 354 points; and the third applicant, 266 points. At the same time, HHS was undertaking a regular review of all of ABCD's 26 Head Start program sites. HHS completed its review of ABCD's Parent Child Center, a special demonstration program providing services for infants and toddlers, on May 10, 1996. The review of this program revealed serious deficiencies in the health, disability, parental involvement and social service components. HHS summarized the problem as one of "inadequate agency capacity to plan, and manage the delivery of Head Start services." Head Start programs are run through the HHS Administration for Children and Families. On August 2, 1996, the local regional administrator, Hugh Galligan, announced the selection of Dimmock as the Head Start agency for the -3- -3- Uphams Corner program. Galligan reported to his superior that "[w]hile ABCD's [periodic review] results are generally positive, a recent review of its Parent Child Center (PCC) program showed it was seriously deficient." This report also ___________________ stated that Dimmock was running a Head Start program in good standing and that both Galligan's organization and its Massachusetts state counterpart "agreed that the Dimmock proposal more clearly responded to the opportunity for creative, comprehensive and flexible programming." On August 14, 1996, ABCD brought this case in the district court, seeking to enjoin the award of funds to Dimmock on the ground that HHS had failed to respect the statutory priority to which ABCD was conditionally entitled under 9836(c)(1). When the administrative record was lodged, the district court found no record of a ruling on ABCD's right to a priority. On December 19, 1996, the court ordered HHS to determine explicitly whether ABCD was entitled to a priority and to explain the reasons for the HHS determination.  In response, HHS filed a declaration of Hugh Galligan stating that ABCD did not qualify for the statutory priority "because of the May 10 finding that ABCD fails to meet program, financial management, and other requirements established by the Secretary," and reaffirming his previous award of the grant to Dimock. HHS also filed a memorandum -4- -4- dated March 21, 1997, from Olivia Golden, then Principal Deputy Assistant Secretary, Administration for Children and Families, ratifying Galligan's selection of Dimock. ABCD then challenged the authority of Golden and Galligan to make this decision. On June 9, 1997, Golden issued a second memorandum, further ratifying all decisions and actions taken by Galligan in the matter up to that date. On July 2, 1997, the district court filed an opinion, Action for Boston Community Development, Inc. v. Shalala, ________________________________________________ _______ 1997 WL 677447 (D. Mass. 1997), granting final judgment in favor of HHS. The court ruled that even if Galligan had lacked the necessary authority at the outset, that gap had been filled by the subsequent ratification. On the merits, the district court found that the decision to withhold the priority was neither in violation of law nor unreasonable under the standards usually applied in reviewing agency action. On the appeal now before us, ABCD's first and most extensive argument is that the decision to withhold the priority, even if properly ratified (which ABCD denies), rested on legal errors. The main thrust of its argument is that the statute does not permit HHS "to deny ABCD its priority . . . on the basis of temporary, program-specific deficiency findings with respect to one of the twenty-six Head Start program sites that ABCD operates, a site that -5- -5- constitutes only a small part of ABCD's overall Head Start program activities." So far as ABCD's issue presents a question of statutory construction--and in some respects it does--our review is de __ novo, tempered by whatever deference is to be accorded to the ____ Secretary's construction of the statute under the Chevron _______ doctrine or otherwise. See Chevron, U.S.A., Inc. v. Natural ___ ______________________ _______ Resources Defense Council, Inc., 467 U.S. 837 (1984). Even _______________________________ without full-scale Chevron deference, courts usually give a _______ respectful hearing to the agency charged with administering a statute. Because our own view of the statute accords with that of HHS, we need go no further than that in the present case. We agree with ABCD that Congress made a considered decision to give a priority to any Head Start agency receiving funds on August 13, 1981. The expressed rationale- -to give preference to stability and experience--may not seem to jibe with the selection of the single, now increasingly ancient date. But choices of this kind are always somewhat arbitrary, and Congress has maintained this priority date, altering the statutory language only slightly over a lengthy period. On this premise, ABCD concludes that Congress therefore _________ must have intended that the condition for denying priority-- "that the agency involved fails to meet program, financial -6- -6- management, and other requirements established by the Secretary"--be based on a "overall" failure to the Head Start agency to meet HHS standards. What ABCD means by "overall" is not entirely clear, but ABCD makes its arguments somewhat more concrete by asserting that the failure of a single program, conducted by a multi-program Head Start agency, cannot be an "overall" failure. Congress could have written the statute in this manner but did not do so. The word "overall" simply does not appear anywhere in the priority provision (section 9836(c)). Given the congressional purpose, we agree that the failure to meet standards would certainly have to be substantial and relevant as opposed to slight or inconsequential. But there is nothing in the language of the priority provision that requires that the failure be one that affects all or many of the programs the agency may be supervising. Further, the failure to manage properly an individual program might be very informative as to the agency's ability to take on new responsibilities. Deficiencies within a single program might be more important to HHS than a single deficiency--say in some aspect of bookkeeping--that infected all of the programs run by a Head Start agency. Whether the failures in ABCD's Parent Child Center were of great magnitude is a different question to which we return below. -7- -7- One could argue, with a better footing in the statutory language, that there must be at least multiple failures of different kinds, since the statute calls for a finding that the agency "fails to meet program, financial management, and ___ other requirements established by the Secretary." Section 9836(c)(1) (emphasis added). The word "and" usually denotes the conjunctive, but the rule is not absolute when contradicted by context, Reiter v. Sonotone Corp., 442 U.S. ______ ______________ 330, 338 (1979), as we think it is here. Especially in light of the catch-all category "other requirements," the term "and" certainly was intended to mean "and/or." This is borne out by common-sense considerations. If a Head Start agency failed utterly in the delivery of program services, Congress could not have intended that its meticulously kept books would assure it a statutory priority as to new programs. As it happens, here Galligan did expressly find, in a determination later ratified by the Acting Assistant Secretary, that ABCD had failed to meet "program, financial management, and other requirements." Finally, there is little mileage for ABCD in its claim that the deficiency cannot be merely "temporary." Practically all deficiencies can be made "temporary" by discovering and rectifying them. The question is whether their existence is a warning signal that the Head Start agency ought to be correcting the deficiencies that exist -8- -8- before it takes on new programs--which might further stretch management resources already shown to be inadequate. ABCD argues that its reading of section 9836 is supported by section 9836a enacted by Congress in 1994. Pub. L. No. 103-252, 108, 108 Stat. 631. Whereas section 9836 involves the designation of Head Start agencies, section 9836a requires HHS to establish quality standards for Head Start agencies and to monitor such agencies and programs. The deficiencies in the Parent Child Center found in the May 10, 1996 report, which Galligan invoked in denying ABCD priority, derived from a monitoring program carried out under the newly enacted section 9836a. ABCD argues that an "overall" failure is required under section 9836(c)(1) because section 9836a refers at one point to the need for the Secretary to promulgate "minimum levels of overall accomplishment" that a Head Start agency must achieve to meet the primary "standards" to be established by the Secretary for program services, for administrative and financial management, and for many other subjects,  9836a(a)(1), (2), and because elsewhere the Secretary is required to conduct a "full review" of each agency at least once every three years. Id. subsection (c)(1)(A). This kind ___ of wrenching words out of context is not persuasive: "overall accomplishment" and "full review" make sense in context, and neither phrase has the same meaning as "overall -9- -9- failure"--the phrase ABCD would like to substitute for the word "failure" in the prior section of the statute. ABCD next objects to HHS' use of the findings made in a periodic review as the basis for denying a statutory priority. ABCD points out that other provisions of section 9835a address the correction of deficiencies found in a periodic review by quality improvement plans and the termination of the agency if the deficiencies are not corrected. But nothing in these provisions prevents HHS from considering the findings of a periodic review in determining under the prior section whether the Head Start agency should lose its priority. If this were an ordinary agency review proceeding, we would now reach the usual question whether the agency had a rational basis for its action or whether, contrariwise, its action was arbitrary, capricious or unreasonable. And, one would expect ABCD to explain why the findings of deficiency relied on by HHS were mistaken or unsupported or why, to the extent they might be correct and adequately supported, they were not sufficiently serious, even taken as a whole, to justify the significant step of the denial of priority. If such an attack were made, we would take it seriously. Agencies are entitled to considerable deference in their formal fact finding and in the application of general standards to specific facts within their expertise, but in -10- -10- neither case is deference unlimited. Congress has, as ABCD argued, treated the priority as a matter of importance (although the condition attached to it is also important). This court has been willing enough even in fairly technical areas to overturn agency decisions which appeared to us to be unreasonable or inadequately supported. See, e.g., Puerto ___ ____ ______ Rico Sun Oil Co. v. EPA, 8 F.3d 73, 76-77 (1st Cir. 1993). ________________ ___ ABCD has chosen not to make such an attack, and we therefore have no occasion to review in detail the findings of the May 10, 1996, review of the Parent Child Center which are summarized in the district court's decision. 1997 WL 677477 at *19. It is enough to say that the criticisms are not narrowly confined or limited to trivial matters. And while ABCD has stressed that the Parent Child program was a small portion of its budget, it implies that the figure is 4 percent of $22 million--most would not regard a million- dollar program as small change. ABCD's next line of argument contests the authority of Galligan to make the priority decision at all. We condense the background which is discussed at length in the district court decision. 1997 WL 677447 at *6-13. The gist of the matter is that, as Regional Administrator, Galligan had from the outset the authority to award Head Start grants, but the Commissioner of Youth and Family Services--then Olivia -11- -11- Golden--had the authority to designate new Head Start agencies. The district court deemed it unclear which of the two officials had the authority to grant or deny the priority, but found that it did not matter. It concluded that even if Galligan had lacked the authority in August 1996, Golden had explicitly ratified his actions in June 1997. By that time, Golden was Principal Deputy Assistant Secretary and had been nominated for the vacant Assistant Secretary position. We agree with the district court that as the Principal Deputy and nominee, Golden could exercise the powers of an assistant secretary. ABCD admits that the proper assistant secretary had the authority to make priority decisions but argues that Golden was nominated for an assistant secretaryship other than the one with authority to decide the issue. Despite some confusion over titles, we adopt the district court's reasoning for rejection of this argument. Id. at *12. ___ ABCD's more interesting argument is that Golden could not ratify Galligan's decision "retroactively." All ratifications are retroactive in the sense that they purport to validate a prior action that might otherwise be unauthorized. But ABCD relies here on an HHS administrative procedural manual that refers to ratification of prior -12- -12- actions being permissible in "special circumstances" and "with the approval" of the general counsel's office.  We know almost nothing about the scope of this provision, or the legal significance of the manual, because ABCD did not make this argument in the district court. ABCD's objection is therefore waived. See McCoy v. ___ _____ Massachusetts Institute of Technology, 950 F.2d 13, 22 (1st ______________________________________ Cir. 1991). Accordingly, we do not reach HHS' alternative argument that the record shows that the general counsel's office informally acquiesced in the ratification. Finally, ABCD says that the ratification is an invalid "post hoc rationalization." This epithet has been used by courts in various ways but most often to prevent agency lawyers from providing in briefs necessary findings or _______ reasoning omitted from the agency's decision. See Motor _______ ___ _____ Vehicle Mfrs. Ass'n v. State Farm Mut. Automobile Ins. Co., ___________________ _____________________________________ 463 U.S. 29, 50 (1983); Burlington Truck Lines, Inc. v. ______________________________ United States, 371 U.S. 156, 168-69 (1962). Nothing of the _____________ sort is presented here: both Galligan and Golden agreed, respectively in May and June 1997, that ABCD was properly denied the priority based on information available to them from the time the grant was originally made to Dimock.  Thus, the usual concern of courts--that the decisionmaker may not have made the necessary determinations- -is absent here. Further, it was the district court itself -13- -13- that ordered HHS to make its priority determination explicit and explain its reasons. See Pension Benefit Guaranty Corp. ___ ______________________________ v. LTV Corp., 496 U.S. 633, 653-54 (1990). Finally, nothing _________ in the 1997 redeterminations violated any procedural requirements: We have been pointed to nothing in the statute or regulations that requires any specific procedures before a priority is denied. See Dubois v. United States Dep't of ___ ______ _______________________ Agric., 102 F.3d 1273, 1289 (1st Cir. 1996), cert. denied, ______ ____________ 117 S. Ct. 2510 (1997). Affirmed. _________ -14- -14-