ACTION FOR BOSTON COMMUNITY DEVELOPMENT, INC., Plaintiff,

v.

Donna SHALALA, Secretary of the United States Department of Health and Human Services, Administration for Children and Families, Region I, Defendant.

Civil Action No. 96–11657–REK.

United States District Court, D. Massachusetts.

July 2, 1997.

Richard Bluestein, Janet Steckel Lundberg, Krokidas & Bluestein, Boston, MA, Garrick F. Cole, Smith & Duggan, Boston, MA, for Plaintiff.

Lori J. Holik, U.S. Atty.'s Office, Boston, MA, for Defendants.

## Opinion

KEETON, District Judge.

The primary claim in this civil action, which is also at least the primary if not the only basis for jurisdiction in this court, is a challenge to a decision of the Secretary (acting through a person to whom authority to decide was allegedly delegated) awarding a grant to another entity rather than to plaintiff Action for Boston Community Development, Inc. ("ABCD"). Plaintiff asserts that the Secretary's decision was arbitrary and capricious. This primary claim is addressed in Part IV of this opinion. This court orders

final judgment for defendant, for the reasons stated in Parts III–IV of this opinion.

Also pending before the court is; Plaintiff's Motion for Injunction Pending Appeal (Docket No. 58, filed June 16, 1997), along with a supporting memorandum (Docket No. 59, filed June 16, 1997). Defendant opposes the motion (Docket No. 61, filed June 19, 1997). For the reasons stated in Part V of this opinion, this motion is denied.

## I. The Facts

### A. Background

In this case, ABCD challenges the decision of the defendant United States Department of Health and Human Services ("HHS") to award a grant under the Head Start Act, 42 U.S.C. §§ 9831–9852 (1995), to provide Head Start services to a certain area of Boston to Dimock Community Health Center ("Dimock") rather than to ABCD.

The Head Start Act authorizes the Secretary of HHS to provide financial and other assistance to Head Start agencies for the delivery of comprehensive health, educational, nutritional, social, and other services to economically disadvantaged children and their families. *See* 42 U.S.C. §§ 9831, 9833. A "Head Start agency" is the public or private nonprofit agency designated by the Secretary as having the capability, power and authority to deliver the Head Start services within a community. 42 U.S.C. § 9836(a). The community served by a particular Head Start agency is not necessarily determined by boundary or political subdivisions, but rather is an area that "provides a suitable organizational base and possesses the commonality of interest needed to operate a Head Start program." 42 U.S.C. § 9836(b).

In designating a Head Start agency for a particular grant to provide Head Start services:

[T]he Secretary shall give priority ... to any local public or private nonprofit agency which is receiving funds under any Head Start program on August 13, 1981, unless the Secretary makes a finding that the agency involved fails to meet program, financial management, and other requirements established by the Secretary.

42 U.S.C. § 9836(c). Under subsection (d) of § 9836, if no agency qualified for the priority set forth in subsection (c), the Secretary may make a decision, based on a number of factors listed in the statute, to designate an agency from among qualified applicants.

The Administration for Children and Families ("ACF"), a department within HHS, administers the Head Start program, including the awarding of grants to provide Head Start services. ACF is headed by the Assistant Secretary for Children and Families. Responsibility for the administration of the Head Start program in the Boston area lies with the Regional Office (Boston is located in "Region I"). Hugh Galligan is the Regional Administrator for Region I.

### B. Administrative Decision

ABCD is an "anti–poverty" agency that provides a variety of community–based services to the City of Boston. ABCD has been a Head Start grantee agency within the City of Boston since 1965, and in 1981 was the only provider of Head Start Services for the City.

In 1982, Esquelita Aquebana, Inc., was chosen as a Head Start grantee to serve a community comprised of the Upham's Corner area of Dorchester, Lower Roxbury and the South End of Boston. Having failed to comply with Head Start standards, however, Esquelita Aquebana, Inc., relinquished its status as a Head Start agency in 1995.

In January 1996, the Boston Regional Office of the ACF issued a notice (Program Announcement No. ACYF–HS–93.6000) soliciting applications for a grant, not to exceed $561,392, to provide Head Start services to the community formerly served by Esquelita Aquebana, Inc. (A.R., Volume I at tab 4).

Three agencies responded to the notice: ABCD, Dimock, and the City Wide Board of the Boston Community Centers. The three applicants were reviewed by an independent panel (not employed by ACF). The review was based on a number of factors, including past performance of the agency and how well the applicant's proposal met the standards and goals of the Head Start program with regard to community needs assessment,

program design and approach, staffing and facilities, services to children and parents, collaborative efforts, and budgeting. (A.R., Volume III at tabs 11–15). ABCD received a total score (out of a possible 500) of 419, Dimock received a score of 354, and City aide Board received a score of 266 (A.R., Volume III at tab 16). Following the independent review, ACF solicited further information from the applicants.

On August 2, 1996, Hugh Galligan, Regional Administrator, issued a Decision Memorandum announcing the selection of Dimock as the recipient of the grant. Galligan stated that Dimock would receive the award over ABCD, despite the latter's higher panel review score, for the following reasons:

> While ABCD's OSPRI [on–site program review] results are generally positive, a recent review of its Parent Child Center (PCC) program showed it was *seriously deficient.*
> Dimock Community Health Center operates a Head Start Comprehensive Child Development Program in good standing. Massachusetts [Department of Social Services ("DSS") ], our partner in this collaboration announcement, is reluctant to fund ABCD's proposal because it fails to adequately address DSS's expectations for comprehensive and creative service for its client population.
> After joint consultation with the three potential grantees both ACF and USS agreed that the Dimock proposal more clearly responded to the opportunity for creative, comprehensive and flexible programming.
> ABCD in its regular Head Start grant for the coming year is proposing to reduce the number of children it serves by 160, more than wiping out the children which would be added by this grant award.

(A.R., Volume IV at tab 26).

## II. Procedural History

Plaintiff filed this civil action on August 14, 1996, challenging as arbitrary and capricious defendant's decision to award the grant to Dimock rather than to ABCD, and seeking declaratory and injunctive relief. Specifically, plaintiff argues that under the terms of 42 U.S.C. § 9836(c)(1) ("the Secretary shall give priority ... to any local public or private nonprofit agency which is receiving funds under any Head Start program on August 13, 1981"), the Secretary was obligated to award the grant to ABCD, which was the only applicant agency receiving Head Start funds in August of 1981. *See also* 42 U.S.C. § 9836(d) (stating that the Secretary may designate a Head Start agency from among qualified applicants "[i]f no entity in a community is entitled to the priority specified in subsection (c))".

Plaintiff then moved for a preliminary injunction (Docket No. 2, filed August 30, 1996), a temporary restraining order (Docket No. 17, filed October 15, 1996), and a stay of the implementation of the Secretary's decision (Docket No. 19, filed October 21, 1996).

At a hearing held on October 17, 1996, the court issued an Order Regulating Proceedings for. Judicial Review of Agency Action (Docket No. 26), in which the court outlined the process to be followed in deciding plaintiff's motions, which involved judicial review of the defendant agency's grant award under the arbitrary and capricious standard.

On October 24, 1996, the court issued a Memorandum and Order (Docket No. 20) denying all of plaintiff's motions for injunctive relief, and directing the defendant to supply the court with the complete administrative record.

On December 17, 1996, the court received the administrative record into evidence and heard the arguments of the parties.

On December 19, 1996, the court issued a Memorandum and Order (Docket No. 45) in which the court "determined that it cannot properly order final Judgment either affirming or setting aside the decision of the Secretary that is under judicial review in this civil action, because the administrative record before the court lacks any showing of consideration by the Secretary (or the Secretary's delegate)" of the issue of the statutory priority contained in 42 U.S.C. § 9836(c). Because of this decision–making gap, the court made the following Interlocutory Order:

This court will defer determination of the disposition of this civil action pending the Secretary's determinations of the following legal and factual questions:

(a) whether Action for Boston Community Development, Inc., did qualify and does qualify for priority in the designation of a Head Start agency;

(b) if not, for what legal and factual reasons;

(c) if so, for what legal and factual reasons; and

(d) what effect, if any, and why, any of the foregoing determinations may have on the decision of the Secretary; and

(e) whether, after consideration of these matters, the decision of the Secretary is to vacate or modify the previous decision to award the grant to Dimock Community Health Center that is the subject of this civil action.

At the December 17, 1996 nonjury trial, the court also directed the defendant to show evidence of proper delegation of the Secretary's authority to Hugh Galligan, the person who made the decisions below.

The defendant having failed to file any response, plaintiff moved on April 30, 1997 for entry of judgment in its favor and for interim injunctive relief (Docket No. 47). In this motion, plaintiff continued to argue that defendant's decision was arbitrary and capricious because HHS had failed even to consider the statutory priority and that, because consideration of the statutory priority would entitle ABCD to the grant "as a matter of law," this court should enter judgment in favor of plaintiff and order injunctive relief in the form of awarding the grant to ABCD. Because of the government's delay in responding to the Interlocutory Order, plaintiff argued, the grant funds at issue were being dissipated, thus causing irreparable harm to ABCD and most likely to the children who would be served by the grant program. Plaintiff also asked, if the court denied its request to order judgment and final relief, that the court order interim injunctive relief in the form of invalidating the grant to Dimock and instituting ABCD as a "replacement grantee" pursuant to a series of regulations governing replacement grants.

Plaintiff's *Memorandum in Support of Motion for Entry of Judgment and For Interim Injunctive Relief* at 16 (Doc. No. 47, filed April 30, 1997) (citing 45 C.F.R. 1302.4 (1996)).

Defendant filed an opposition to plaintiff's motion (Docket No. 50, filed May 15, 1997), submitting along with it a document entitled "The Secretary's Response to the Interlocutory Order Dated December 19, 1996" (Docket No. 51, filed May 15, 1997). The response was in the form of a Declaration of Hugh Galligan, the Secretary's purported delegate. In his Declaration, Galligan stated that:

1. I am the Regional Administrator for the Administration for Children and Families ("ACF"), a division of the Department of Health and Human Services ("HHS"), in Region I. I submit this declaration in response to the Court's Interlocutory Order dated December 19, 1996.

2. On March 21, 1997, Olivia Golden, Principal Deputy Assistant Secretary for the Administration for Children and Families ("ACF"), [footnote omitted] signed an affirmation and ratification of the actions taken by me in selecting Dimock Community Health Center ("Dimock") as the Head Start grantee to provide services in the Upham's Corner area of Dorchester, lower Roxbury and the South End in the City of Boston under Program Announcement No. ACYF–HS–93.600. Deputy Assistant Secretary Golden also redelegated to me, as the Regional Official, the authority to make the additional decisions regarding the award of funding required by this Court in *Action for Boston Community Development, Inc. v. Shalala et al.,* 983 F.Supp. 222. A copy of her memorandum is attached hereto.

3. Action for Boston Community Development, Inc. ("ABCD") did not and does not qualify for priority in the designation of a Head Start agency.

4. ABCD did not and does not qualify for said priority because of the May 10, 1996 finding that ABCD fails to meet program, financial management, and other requirements established by the Secretary. *See*

Administrative Record, volume II, tab 10. Pursuant to 42 U.S.C. § 9836(c)(1), the Secretary is not required to give a priority designation where the Secretary has made "a finding that the agency involved fails to meet program, financial, management, and other requirements established by the Secretary." The May 10, 1996 letter and attached report, which provided ABCD with "detailed information on all areas in which [its] program was not meeting minimum Head Start standards" based upon a March, 1996 on–site monitoring visit, constitutes such a finding.

5. These determinations fully support the August 2, 1996 decision to select Dimock as grantee for the subject grant. In the absence of an agency entitled to a priority, the Secretary may designate a Head Start agency from among qualified applicants in such community, and shall consider the effectiveness of each applicant to provide Head Start services based upon the factors set forth in 42 U.S.C. § 9836(d). I considered these factors in 1996 and concluded that the grant should be awarded to Dimock based upon its submissions as deflected in the administrative record now before the court.

6. After consideration of these matters, my decision is to ratify and affirm the previous decision to award the subject grant to Dimock Community Health Center.

Declaration of Hugh Galligan (Doc. No. 51).

The court denied plaintiffs's motion for interim injunctive relief at a hearing held on June 6, 1997. In a colloquy with plaintiff's attorney, the court reiterated its view that, if plaintiff were to prevail on the merits of its claim, the proper form of relief would be to remand the case to HHS. The court remained doubtful that it has authority to grant the type of relief requested by plaintiff, namely that the court order that the Head Start grant be awarded to ABCD.

The court noted, however, that the defendant had not made the required showing of delegation to Galligan to make the decisions at issue in this case. The court ordered the defendant to submit forthwith sufficient evidence of proper delegation of the Secretary's authority to make the decision regarding the award of the grant to Dimock over ABCD to the Regional Administrator.

On June 12, 1997, defendant made a submission regarding the delegation issue (Docket No. 54). At a hearing on the same day, the court took the issue under advisement, and plaintiff declared its intent to appeal the court's denial of its motion for interim injunctive relief.

Plaintiff has moved in this court for an injunction (Docket No. 58, filed June 16, 1997) that prohibits HHS from refunding (that is, funding again, for another term) the grant at issue in the case until the appeal is resolved. Along with its opposition to the motion, defendant filed another declaration of Galligan (Docket No. 62) in which he states that on June 13, 1997, ACF issued a grant award in the amount of $460,000 to Dimock, "which provides full funding for the operation of its Head Start program year which runs from February 1, 1997 to January 31, 1998." Declaration of Hugh Galligan (Doc. No. 62).

## III. Issues Regarding the Standard of Judicial Review of the Administrative Decision

### A. Introduction

For the reasons stated below, I conclude that the decisions of HHS regarding the award of the grant to Dimock rather than to ABCD, including the decision that ABCD was not entitled to the statutory priority set forth in 42 U.S.C. § 9836(c), were not arbitrary and capricious, or otherwise not in accordance with the law. As part of this conclusion, I determine that the authority to make the decisions regarding the grant award, including the applicability of the statutory priority, has been properly delegated to Hugh Galligan.

### B. Issues Regarding Delegation

Reaching a decision about whether the Secretary's authority has been properly delegated to the person who in fact made the decision is complicated by the fact that the defendant has failed to provide a clear and concise showing of any purported delegation. Contradictions between facts asserted by

representatives of the defendant and those contained in public records, moreover, add to the confusion. Nevertheless, I determine that, in making the initial decision to award the grant to Dimock rather than ABCD, and in making the subsequent determination that ABCD was not entitled to the statutory priority because of program deficiencies, Hugh Galligan was exercising authority properly delegated to him.

Congress vested authority to administer the statutory provisions of the Head Start Act in the Secretary of HHS. The Department of Health and Human Services was established as an executive department, under the name of the Department of Health, Education and Welfare, by Congress in 1953. *See* 42 U.S.C. § 3501. Section 3501 made effective the Reorganization Plan Number 1 of 1953, which set forth the provisions for the organization of the department. *Id.* (setting out as a note to § 3501 the provisions of the Reorg. Plan No. 1 of 1953, ch. 14, 67 Stat. 631). Section 6 of the Reorganization Plan, titled "Performance of functions of the Secretary," states that:

> The Secretary may from time to time make such provisions as the Secretary deems appropriate authorizing the performance of any of the functions of the Secretary by any other officer, or by any agency or employee, of the Department.

*Id.*

On April 18, 1991, then-Secretary of HHS Louis Sullivan issued a notice in the Federal Register establishing the Administration for Children and Families as an Operating Division of HHS. Notice of Reorganization Order, 56 Fed.Reg. 15,885 (1991) (hereinafter "Notice I"). This order of organizational change, made "[u]nder the authority of Section 6 of the Reorganization Plan of 1953 and pursuant to the authorities vested in [Sullivan] as Secretary of Health and Human Services," transferred various functions to the ACF, to be headed by the Assistant Secretary for Children and Families, reporting to the Secretary. *Id.* Under the Secretary's order, the Assistant Secretary' for Children and Families would "also retain the title of Assistant Secretary for Family Support and

the title of Director of the Office of Child Support Enforcement." *Id.*

On August 27, 1991, Secretary Sullivan published another notice in the Federal Register setting forth in greater detail the structure and functions of the ACF. Notice of Statement of Organization, Functions and Delegations of Authority to Administration for Children and Families, 56 Fed.Reg. 42,-332 (1991) (hereinafter "Notice II"). In this notice, the Secretary delegated to the Assistant Secretary for the Administration for Children and Families "[a]uthority to administer the · Head Start Program under the Head Start Act, 42 U.S.C. § 9801 *et seq.*, and as amended, now and hereafter." Notice II, 56 Fed.Reg. at 42,352. As the only explicit limitation on the authority delegated to administer the Head Start Act, the Secretary stated that he was not delegating the authority to issue regulations or submit reports to Congress. *Id.* at 42,354.

On October 13, 1994, in a copy of a memorandum submitted by the defendant, the most recent Assistant Secretary for Children and Families, Mary Jo Bane, redelegated a series of program authorities to various ACF employees. Specifically, the Assistant Secretary redelegated to the Regional Officers the authority to "[a]pprove/disapprove applications and make awards for grants and amendments to Head Start agencies" under 42 U.S.C. § 9833. The authority to designate Head Start agencies under subsections (a) and (d) of 42 U.S.C. § 9836 was redelegated to the Commissioner of the Administration for Children, Youth and Families ("ACYF"), a department within the ACF.

ABCD does not seriously challenge the authority of Galligan, as Regional Administrator, to award grants to designated Head Start agencies. Indeed, under the series of delegations described, this decision-making authority has properly been delegated from the Secretary (in the August 27, 1991 notice) through the Assistant Secretary of ACF (in the October 13, 1994 memorandum) to Regional Administrator Galligan. As plaintiff concedes, there is no support for an argument that a delegation by a Secretary of a previous executive administration is not valid in subsequent administrations.

Plaintiff argues, however, that Galligan lacked the authority to determine the applicability of the statutory priority contained in § 9836 when he made the additional decisions in response to this court's Interlocutory Order.

■ Two possible sources of valid delegations of authority can be identified. One possibility is that the October 13, 1994 memorandum vested the authority to determine the applicability of the statutory priority in the Regional Administrators; in other words, that Galligan possessed the authority to consider the statutory priority all along.

From the record before me, and examination of the relevant statutory and regulatory background, I conclude that it is unclear whether the October 13, 1994 memorandum represents a valid delegation of this authority to the Regional Administrator. The memorandum states that authority to designate a Head Start agency under § 9836(a) and (d) are delegated to the Commissioner of the ACYF, not to the Regional Officer who awards the grant to the designated entity. Although the October 13, 1994 memorandum states that the Commissioner may redelegate, in whole or in part, any authority vested in the Commissioner, no evidence in the administrative record shows that the Commissioner actually delegated to Galligan the authority to *designate* the Head Start agency.

Unfortunately, the regulations that govern the Head Start grants decision-making process do not help to clarify whether the authority in question has been delegated. The regulations set forth the "Policies and Procedures for Selection, Initial Funding, and Refunding of Head Start Grantees, and For Selection of Replacement Grantees." 45 C.F.R. §§ 1301–1308 (1996). Subpart B of § 1302 describes the bases for selecting Head Start grantees. "Head Start grantees" are defined as those agencies "whose application to operate a Head Start program pursuant to section 514 of the Act [a previous formulation of 42 U.S.C. § 9836(c) ] has been approved by the responsible HHS official." § 1302.2. Subpart B sets forth a set of general criteria for selecting applicants in addition to those provided for in § 9836(d) of the Head Start statute, additional considerations for replacement grants, and a directive that the official selecting the grant recipient give priority to agencies receiving Head Start funds on January 4, 1975. §§ 1302.10–1302.12.

The regulations refer to the "responsible HHS official" as the official "who has the authority to make grants under the Act." § 1302.2. Under the regulations, the "responsible HHS official" is the person responsible for selecting the grantee, applying the selection criteria, and considering the applicability of the priority for existing Head Start agencies. *See* § 1302.12. The October 13, 1994 memorandum from Assistant Secretary Bane, however, distinguishes between the Regional Official, who has the authority to "approve/disapprove applications and make awards for grants ... to Head Start agencies," and the Commissioner of the ACYF, who has the authority to designate the Head Start agencies under the statutory selection criteria to which the regulations refer.

In these circumstances, it is possible that the Assistant Secretary delegated to the Regional Officials only the authority to award grant programs to agencies that have already been designated as the most appropriate Head Start agency, and not the authority to assess the qualifications of the potential Head Start agency (which, according to the October 13 memorandum was delegated to the Commissioner of the ACYF). Although the October 13, 1994 memorandum refers only to subsections (a) and (d) of § 9836, subsection (d) directs the Secretary (or her delegate) to apply the criteria listed therein *only if* there is no applicant agency that qualifies for the statutory priority set forth in subsection (c). It is possible that the ACF has developed a set of policies and procedures, informal and formal, that enable the Regional officers to make the priority determination, but nothing in the record before me provides any basis upon which I can determine that such a delegation has occurred. For this reason, I cannot determine whether Galligan possessed the relevant authority by virtue of the October 13 memorandum.

I note, however, that in one of the few opinions involving judicial review of the Head Start grant award process, the Court of Appeals for the Seventh Circuit stated, without explanation, that "[t]he Secretary's authority to select and terminate Head Start grantees in wisconsin has been delegated to the Assistant Regional Administrator of ACF's Office of Family Supportive Services." *Head Start Family Education Program, Inc. v. Cooperative Educational Service Agency 11*, 46 F.3d 629, 631 (7th Cir.1995). Although this statement lends support to the inference that the authority to determine the applicability of the statutory priority has in fact been delegated to regional administrators like Galligan, it is not definitive for purposes of this case. First, delegation was not an issue in the case just cited, and the statement therefore was not, in strictest sense, a holding. Second, delegation to the Assistant Regional Administrator in Wisconsin does net necessarily mean (although it probably does mean) that the authority was delegated to the Regional Administrator in Massachusetts. Third, the case before the Court of Appeals for the Seventh Circuit was argued shortly after the October 13, 1994 redelegation memorandum, and thus it is possible that the memorandum represented a change in the distribution of authority among the regional officers and the Assistant Secretary for the ACF. Of course, these questions persist largely because of the incomplete record before this court.

I conclude, in any case, that Galligan's decisions have been validly ratified and reauthorized. In its submission on the delegation issue, defendant provided a memorandum, dated June 9, 1997, in which Olivia Golden, Principal Deputy Assistant Secretary for the ACF, redelegated to the Regional Administrator the authority to select the Head Start grantee to provide services to the area in question. The memorandum states that the authority redelegated includes the "authority to make decisions regarding the application of 42 U.S.C. 9836(c), and to make the additional decisions regarding the award of funding required by the Court in *Action for Boston Community Development, Inc. v. Shalala, et al.*, No. 96–11657–REK, [983 F.Supp. 222] (D.Mass.)." Although this act occurred after the date of Galligan's Declaration, Golden affirms and ratifies all actions taken by the Regional Administrator with regard to the funding decision before the effective date of the redelegation contained in the June 9, 1997 memorandum.

Plaintiff argues that Golden's ratification and redelegation is invalid, because Golden is not the Assistant Secretary for the ACF. Mary Jo Bane, the last Assistant secretary for the ACF, resigned in September, 1996. As of the date of this opinion, no one has been formally confirmed to fill Bane's position.

■ The office of the Assistant Secretary for the ACF is one that requires Presidential appointment with the advice and consent of the Senate. *See* 42 U.S.C. §§ 3501, 3501a (establishing four positions of Assistant Secretary at HHS, their duties to be determined by the Secretary). At the most recent hearing held in this case, some discussion occurred about whether the position of the Assistant Secretary for the ACF is one that requires nomination by the President and confirmation by the Senate. Although the defendant has not provided a firm statement about the nature of this position, the court has determined that it is a position that requires formal appointment and confirmation. In addition to the statutory provisions cited above, support for this determination can be found in the Congressional Record, which notes that the Senate received the President's nomination of Mary Jo Bane, the last Assistant Secretary for the ACF, on May 24, 1993, 139 Cong. Rec. S6,389–07 (daily ed. May 24, 1993), and that the nomination was confirmed on October 7, 1993. 139 Cong. Rec. S13,295–03 (daily ed. October 7, 1993).

Procedures for temporarily filling vacancies in executive offices are governed by 5 U.S.C. §§ 3345–3549, popularly known as the "Vacancies Act." Because the Assistant Secretary for the ACF is an officer whose appointment must be made by the President with the advice and consent of the Senate, § 3346 of the Act applies. This section states that:

> When an officer of a bureau of an Executive department or military department,

whose appointment is not vested in the head of the department, dies, resigns, or is sick or absent, his first assistant, unless otherwise directed by the President under section 3347 of this title, shall perform the duties of the office until a successor is appointed or the absence or sickness stops. 5 U.S.C. § 3346. Section 3347 of Title Five allows for the President to appoint the head of another executive department, or another constitutional officer, instead of the first assistant, to fill the vacancy. Because there is no evidence that the President utilized his authority under § 3347 in this case, § 3346 governs.

The provisions of the Vacancies Act are designed to be temporary in nature and effect:

(a) A vacancy caused by death or resignation may be filled temporarily under section 3345, 3346, or 3347 of this title for not more than 120 days, except that—

(1) if a first or second nomination to fill such vacancy has been submitted to the Senate, the position may be filled temporarily under section 3345, 3346, or 3347 of this title—

(A) until the Senate confirms the nomination; or

(B) until 120 days after the date on which either the Senate rejects the nomination or the nomination is withdrawn; or

.   .   .   .   .   .

5 U.S.C. § 3348(a). Section 3348 also states that a vacancy may not be temporarily filled by a person whose nomination to that position his been rejected or withdrawn. Section 3349 states that "[a] temporary appointment, designation, or assignment of one officer to perform the duties of another under section 3345 or 3346 of this title may not be made otherwise than as provided by those sections, except to fill a vacancy occurring during a recess of the Senate." 5 U.S.C. § 3349.

Plaintiff argues that Olivia Golden cannot validly redelegate authority to Galligan, or ratify his actions, because under the terms of the Vacancies Act, she is not acting with the authority of the Assistant Secretary of the ACF.

The defendant filed a Further Submission Regarding Delegation of Authority (Docket No. 55, filed June 13, 1997), to which it attached an affidavit of Robert A. Dublin, Chief of Litigation of the Children, Families and Aging Division of the Office of General Counsel at HHS. In his affidavit, Dublin states that as Principal Deputy Assistant Secretary for the ACF, Golden is the highest ranking official at the ACF, no replacement for Assistant Secretary Bane having been named. Dublin states that Golden was "appointed" as Acting Assistant Secretary of the ACF on September 28, 1996, but that because the appointment was limited by law to 120 days, Golden's term as Acting Assistant Secretary ended on January 27, 1997. Although Dublin does not identify the law that he claims limited Golden's term, the court will assume that he is referring to the provisions in the Vacancies Act.

The defendant takes the position that, as the highest ranking official in the ACF, Golden can exercise the authority of the Assistant Secretary of the ACF indefinitely, without any further formal action, because the terms of the Vacancies Act do not apply. Defendant argues that "[t]he 120 day limitation of 5 U.S.C. § 3348, by its very terms, applies only to formal nominations such as the time period during which Ms. Golden was named as Acting Assistant Secretary, as explained in the Dublin Declaration." Defendant's Opposition to Plaintiff's Motion for Injunction Pending Appeal at 4 n. 4.

First, the defendant has not provided any evidence of a "formal" appointment of Golden by anyone who had the authority to make such an appointment. Section 3347 allows for the President to appoint officers to fill executive vacancies, but no evidence in the record before me shows such an appointment. Section 3346 allows for the first assistant to assume the duties and authorities of the absent officer without a formal appointment, but that arrangement is allowed to proceed for only 120 days, which the defendant concedes has expired.

The defendant has not provided any support, in the form of facts or legal authority, for its contention that the position of Assistant Secretary for the ACF may be filled in a

manner other than under the terms of the Vacancies Act. The defendant's argument that Golden may informally act in the stead of the Assistant Secretary ignores § 3349, which explicitly states that an executive vacancy covered by the provisions of § 3346 may not be filled in any other manner.

The bearing of the Vacancies Act on positions within the Department of HHS is clarified in legislative documents issued pursuant to the most recent amendments to the Act. In 1988, Congress amended § 3348 by extending the time in which an official executive position could be temporarily filled under the Act from 30 to 120 days, and by adding the exception to the time limitation in cases where the President has submitted a nomination for the position to the Senate. *See* Presidential Transitions Effectiveness Act of 1988, Pub.L. 100–398, § 7, 102 Stat. 985, 988. The 1988 amendments were contained in a piece of legislation aimed at easing transitions between different executive administrations. *Id.*

Although the House report accompanying the bill that was enacted in 1988 does not mention the changes to the Vacancies Act in particular, a committee report issued pursuant to the Senate's version of the bill discusses the applicability of the Vacancies Act to modern executive administrative agencies. *See* S.Rep. No. 100–317, at 13–14 (1988). In particular, the senate report rejects the position advanced by the General Counsel for the Department of HHS, that the Act does not apply to vacancies in positions governed by the agency's enabling statute. Noting these and other conflicting views on the viability of the Vacancies Act, the report stated that:

> Given these competing views, it is time to decide whether to keep this statute, and, if so, how to make it relevant to the modern presidential appointments process. Under S.2037, the Committee expresses its desire to revitalize the Vacancies Act by amending it to allow the President 120 days to fill vacancies temporarily unless a nomination to fill the vacancy has been submitted to the Senate, and by applying the Act to all executive agencies.
>
> The committee also believes that the present language, however old, makes clear

that the Vacancies Act is the exclusive authority for the temporary appointment, designation, or assignment of one officer to perform the duties of another whose appointment requires Senate confirmation. The exclusive authority of the Vacancies Act would only be overcome by specific statutory language providing some means for filling vacancies. As such, the Committee expressly rejects the rationale and conclusions of other interpretations of the meaning and history of the Vacancies Act, including the opinion of the General Counsel of Health and Human Services cited above.

*Id.* at 14.

As the first assistant to the Assistant Secretary for the ACF, Olivia Golden apparently validly exercised the authority of the Assistant Secretary for 120 days, under the terms of 5 U.S.C. § 3346. On March 21, 1997, however, the day that Galligan states Golden first redelegated to him the requisite authority and ratified his actions, Golden was not validly exercising authority as the Assistant Secretary, her term having lapsed under the Vacancies Act. The legal force of Golden's ratification and redelegation on March 21, 1997 is debatable. *See* 65 Conp. Gen. 626, 633 (1986) (noting, in a decision of the Comptroller General explicitly approved by the Senate Committee in its 1988 report, that the legal status of actions taken by temporary appointees after the time limitation of § 3348 has expired is "uncertain"). The Vacancies Act contains a manifestation of a congressional intent to curb unreasonable presidential delay in filling executive vacancies and to prevent the President from filling vacancies temporarily for long periods of time. *See* S.Rep. No. 100–317 at 14: 65 Comp. Gen. at 631. Defendant's position that Golden may exercise the authority of the Assistant Secretary of the ACF indefinitely, without any action by the President, is incompatible with both the plain language of the statute and the expression of legislative intent that it embodies.

I conclude, nevertheless, that Golden validly exercised the authority of the Assistant Secretary on June 9, 1997, when she again redelegated authority to Galligan and ratified

his previous actions. My conclusion is based upon the exception to the time limitation contained in § 3348. Under the 1988 amendments, § 3348 allows the appropriate officer to occupy a vacant executive position for longer than 120 days if a nomination to fill that position has been submitted to the Senate. 5 U.S.C. § 3348(a)(1).

Plaintiff argues that no evidence of record shows that Golden has been nominated to be Assistant Secretary of the ACF, or that any person has received such a nomination. Given Dublin's affidavit and the lack of any evidence in the record that a nomination has been made, I understand plaintiff's sense of frustration about the insufficiency of defendant's filings with the court. Based upon the content of the official congressional records discussed below, however, I am of the view that Golden has in fact been nominated for the position.

On April 16, 1997, the Senate received a presidential nomination for Olivia Golden to be "Assistant Secretary for Family Support, Department of Heath and Human Services, vice Mary Jo Bane, resigned." 143 Cong. Rec. S3,301–04 (daily ed. April 16 1997). Plaintiff argue; that "Assistant Secretary for Family Support" is not the same as the Assistant Secretary for the ACF. The nomination itself, however, purports to fill the vacancy left by Mary Jo Bane. Moreover, when Bane was nominated and confirmed in 1993, the position to which she was named was listed as the "Assistant Secretary for Family Support." 139 Cong. Rec. S6,389–07 (daily ed. May 24, 1993); 139 Cong. Rec. S13,295–03 (daily ed. October 7, 1993). Mary Jo Bane was never nominated or confirmed for any other position, but during her tenure at HHS she acted as the Assistant Secretary for the ACF. My inference that these positions are in fact the same is confirmed by the statement by Secretary Sullivan in the April 18, 1991 notice of reorganization that "[t]he Administration for Children and Families shall be headed by the Assistant Secretary for Children and Families and shall report to the Secretary and shall also *retain the title of Assistant Secretary for Family Support.*" Notice I, 56 Fed.Reg. at 15,886.

Taking account of all these circumstances, the court determines that Olivia Golden has been nominated to be the Assistant Secretary for the ACF, and that pending the confirmation or rejection of her nomination as Assistant Secretary, she is not prohibited from acting as the Assistant Secretary's first assistant under the terms of § 3348.

The court notes that the Comptroller General, in its 1986 decision, stated that "[i]t has long been held by the Attorney General that after a vacant position has been temporarily filled under the Vacancies Act the power conferred by the Act is exhausted and the President does not have the authority to appoint either the same or another official to temporarily fill the Office for an additional period." 65 Comp. Gen. at 530 (citing 16 Op. Att'y. Gen. 596 (1880); 18 Op. Att'y. Gen. 50 (1884); 20 Op. Att'y. Gen. 8 (1891)). Of course, opinions of the Comptroller General and the Attorney General are not binding precedent on this court. More important, however, is the fact that this decision was rendered before the 1988 amendments to the Vacancies Act, which for the first time provided an exception to the time limitation contained in § 3348 in circumstances where the President has submitted a nomination to the Senate. Because the purpose of the Vacancies Act is to prevent the President from filling vacancies temporarily for long periods of time, it makes sense that once a vacancy caused by death or resignation has been filled for 120 days, it may not be temporarily filled under terms of the Act again. Where, as here, however, the President has submitted a nomination to the Senate, it would defeat the purpose of the Vacancies Act, and unreasonably interfere with the presidential appointments process, to hold that the person nominated cannot exercise the authority of the position in question during the pendency of her confirmation under § 3348(a)(1).

Because Golden was nominated on April 27, 1997, her actions on June 9, 1997, in redelegating the authority to determine the applicability of the statutory priority to Galligan, and in ratifying his actions taken before that redelegation, were a valid exercise of the

authority of the Assistant Secretary of the ACF.

### C. Supplementation of the Administrative Record

Plaintiff argues that the court should not accept the Galligan Declaration as part of the administrative record in this case, because the Declaration constitutes an impermissible "post hoc" rationalization of the agency's decision.

■ It is true that, in general, courts view critically post-hoc explanations and reject those explanations that cannot be supported by the facts contained in the initial administrative record, or that offer new rationales for the past decisions. *See, e.g., Sierra Club v. Marsh,* 976 F.2d 763, 772–74 (1st Cir.1992). In this instance, however, plaintiff's argument for application of that general rule is based on a misinterpretation of the nature of the Galligan Declaration (as ratified by Golden).

■ In its December 19, 1996 order, this court directed the Secretary (or her delegate) to consider legal and factual questions not yet decided and to make a new decision regarding the grant award that incorporated the consideration of these questions. In essence, the December 19, 1996 order remanded the decision to the agency, although the court retained jurisdiction in order to expedite a final adjudication in this court. The Secretary's delegate then considered the issue of the statutory priority and, based on the administrative record before him at the time of the initial decision, decided that the priority did not apply and that the decision to award the grant to Dimock should not be disturbed.

I conclude that the Galligan Declaration sufficiently completes the administrative record in accordance with the December 19, 1996 Interlocutory Order.

### D. Standard of Review

■ Review of plaintiff's claim that defendant violated its statutory duty under 42 U.S.C. § 9836(c) to afford priority to ABCD in awarding the Head Start grant is governed by the standard set forth in 5 U.S.C.

§ 706(2)(A). *See Head Start Family Educ. Program, Inc. v. Cooperative. Educ. Serv. Agency 11,* 46 F.3d 629, 633 (reviewing a claim regarding denial of a Head Start grant under § 706(2)(A)). Under this standard, an agency's actions, findings and conclusions are not to be set aside unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

■ This standard places strict limitations on the scope of the reviewing court's authority, and a court may not substitute its own judgment for that of the agency decision-maker. *See Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983). A reviewing court will presume the validity of the agency action. *Sierra Club,* 976 F.2d at 769. The standard does impose a significant responsibility on the court, however, and the court must carefully review the record "to see if the agency decision, in the context of the record, is too 'unreasonable' (given its statutory and factual context) for the law to permit it to stand." *Id.* (quotation marks omitted).

## IV. The Outcome of Judicial Review

### A. Status of Plaintiff's claims

Because of the supplemental administrative decisionmaking occurring in response to this court's Interlocutory Order, plaintiff's claim that the decision to award the grant to Dimock was arbitrary and capricious because defendant did not even consider the applicability of the statutory priority is now moot. The core of plaintiff's remaining argument at this time is that the Secretary's delegate acted arbitrarily and capriciously in denying ABCD a statutory priority to which it was allegedly entitled. Plaintiff argues that Galligan's decision, based upon the finding of program deficiencies at only one of ABCD's many Head Start programs, was impermissible in light of the statutory mandate and legislative history of the Head Start Act.

ABCD asserts that the history and language of the Head Start Act (and its earlier statutory embodiments) reveal a strong Con-

gressional preference, increasing in force over time, in favor of awarding Head Start grants to agencies (like ABCD) that have a long history of providing Head Start services.

### B. Relevant Legislative History

The first "Project Head Start" was established under the Economic Opportunity Act of 1964, Pub.L. 88–452, 78 Stat. 508 ("EOA"). *See* S.Rep. No. 97–158, at 3 (1981) (tracing the history of the Head Start Act before 1981). The EOA also provided for the designation of "community action agencies," community-based entities that would provide services and assistance to disadvantaged people. *Id.* Project Head Start was designed as one of these services that would target pre-school children. *Id.*

After a series of amendments not relevant here, Congress in 1974 passed the Headstart, Economic Opportunity, and Community Partnership Act of 1974, Pub.L. 93–644, 88 Stat. 2291. Section 714(c) of the Act (amending Title V of the EOA by inserting § 514(c)) stated that:

> In the administration of the provisions of this section, the Secretary shall give priority in the designation of Headstart agencies to any local public or private non-profit agency which is receiving funds under any Headstart program on the date of the enactment of this Act, except that the Secretary shall, before giving such priority, determine that the agency involved meets program and fiscal requirements established by the Secretary.

The House Report accompanying the bill contains the following commentary regarding the priority:

> The Committee has heard testimony on and received evidence of efforts in at least one Federal region to reorganize Headstart grantees and to shift funds and control away from the community agencies which have had as much as eight years of experience operating Headstart. Section 714(c), which gives continued priority for funding to existing Headstart grantees, makes clear that decisions to terminate or deny refunding of a grantee can be made only for failure to comply with program

and fiscal requirements established by the Secretary.

H.R.Rep. No. 93–1043, at 27 (1974), *reprinted in* 1974 U.S.C.C.A.N. 8043, 8055.

In 1981, Congress passed the Head Start Act, Pub.L. 97–35, Title VI, 95 Stat 499 (1981)(codified as amended at 42 U.S.C. §§ 9331–9858 (1995)). As enacted, § 641(c) of the Act (codified as § 9836(c)) stated that the Secretary shall give priority to agencies receiving Head Start funds on the date of the Act, except that:

> (1) the Secretary shall, before giving such priority, determine that the agency involved meets program and fiscal requirements established by the Secretary; and

> (2) if there is no such agency because of any change in the assistance furnished to programs for economically disadvantaged persons, then the Secretary shall give priority in the designation of Head Start agencies to any successor agency which is operated in substantially the same manner as the predecessor agency which did receive funds in the fiscal year preceding the fiscal year for which the determination is made.

In the Senate Report accompanying the bill that gave rise to the Act, the Senate Committee on Labor and Human Resources stated:

> Section 7(c) of the bill retains the provision of Section 514(c) of the existing Head Start enabling law in which the Secretary is required to give priority in the designation of Head Start agencies to agencies receiving funds on the date of enactment of the Act and which continue to meet requirements. The Committee believes that this provision will promote stability, program[m]atic expertise and administrative competence. However, some Head Start grantees at the local level are community action agencies that could lose Federal funding in the future due to proposed legislative changes regarding the Community services Administration. Thus section 7(c) expands the existing provision as follows:

> If a local community action agency closes or for other reasons is no longer an appropriate Head Start grantee, then the priority in the designation of the Head Start

agency in that local community shall go to either the current delegate agency or the current Head Start director and policy council or some combination thereof, as long as the agency meets program and fiscal requirements set by the State.

Except as may be necessary to carry out the purposes of these provisions, it is not the intent of the Committee to encourage the creation of numerous smaller grantees. Rather, it is the intent of the Committee to promote continuity in the administration of Head Start programs at the local level and to give priority to organizational arrangements that reflect the current situation and meet the needs of the local community.

S.Rep. No. 97–158., at 12 (1981).

The Head Start Act was amended in 1984. *See* Human Services Reauthorization Act, Pub.L. 98–558, Title I, 98 Stat. 2878 (1934). The legislation amended § 9836(c) by changing the language that the Secretary was to make the finding that the agency satisfied program and fiscal requirements before granting the priority to the current phrasing, in which the Secretary must give the priority "unless" he or she makes a finding that the agency fails to meet these requirements. The 1984 amendments also established subsection (d) of § 9836, which stated that:

> If there is no Head Start agency as described in subsection (c)(2), and no existing Head Start program serving a community, then the Secretary may designate a Head Start agency from among the qualified applicants in such community . . .

Human Services Reauthorization Act, Title I, § 104, 98 Stat. at 2879. Subsection (d) as originally configured stated that the designation under the subsection would be governed by standards previously established by the Secretary and made applicable to all Head start programs. *Id.*

The Senate Report regarding this set of amendments stated that the bill:

> modifies the requirement under which selection of Head Start grantees is to be made to clarify that any Head Start grantee must be located within the community to be served by the grantee, and to require the Secretary to make a finding that an existing grantee fails to meet programmat-

ic and fiscal requirements before a priority for designation can be denied.

> The committee wants to make clear that the Department of Health and Human Services may award an expansion grant to a new grantee in an area already served by an existing grantee but only after the Department has first given priority to the existing grantee.

S.Rep. No. 98–484, at 17 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4847, 4854.

The 1990 amendments to the Head Start Act combined the previous parts of subsection (c) of § 9836 into one subpart, and added as subparts (2) and (3) to subsection (c) a provision requiring the Secretary to conduct full reviews of each Head Start agency at least once every three years to "determine whether each agency meets program and fiscal requirements established by the Secretary." Human Services Reauthorization Act of 1990, Pub.L. 101–501, § 107 104 Stat. 1224, 1229. Subpart (4) was also added to § 9836(c), stating that the review described in subsections (2) and (3) "shall not be sufficient alone for the purpose of determining whether to continue, or to discontinue, providing funds to a particular Head Start agency." 104 Stat. at 1230.

The Conference report on the bill that formed the basis for the 1990 amendments shows that subsection (4) was added only after the House withdrew its objection to the Senate's amendment requiring triennial reviews of each Head Start agency. Subsection (4) was added in order to clarify "that such evaluations alone are not a condition of refunding. In cases of unsatisfactory evaluations, the conferees expect the Secretary to work with individual grantees to correct deficiencies." H.R. Conf. Rep No. 101–816, at 164 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1981.

In the Head Start Improvement Act of 1992, Pub L. 102–401, 106 Stat. 1956, Congress amended § 9836(c)(1) to state that the Secretary "shall not give such priority to any agency with respect to which financial assistance has been terminated, or an application for refunding has been denied." 106 Stat. at 1957. This paragraph referred to termi-

nations or denials of refunding that occurred after formal proceedings under another part of the statute. The 1992 amendments also elaborated on the triennial review provisions. The House Report accompanying the Head Start Improvement Act emphasized purported congressional concerns regarding the quality of Head Start programs. The House Report noted that the review procedures were designed to target the large number of new grantees as well as established programs that monitoring reveals to be "high risk." H.R.Rep. No. 102–763, at 16 (1992), *reprinted in* 1992 U.S.C.C.A.N. 1338, 1345.

In 1994, Congress passed the most recent amendments to the Head Start Act. *See* Human Services Amendments of 1994, Pub.L. 103–2–2, § 107, 108 Stat. 623, 629. The amendment to subsection (c) enacted the current language, substituting "program, financial management, and other requirements established by the Secretary" for "program and fiscal requirements established by the secretary." The House Report regarding the proposed amendments stated that "[t]he Secretary is still required to give a priority to programs that operated Head Start programs on the date of enactment, unless the program has been terminated or found to be out of compliance by the Secretary of the Head Start performance standards." H. Rep. No. 103–483(I), 1994 WL 164512, at 204.

The 1994 amendments also deleted the parts regarding triennial review of Head Start agencies from subsection (c), including the provision stating that the review results would not be sufficient for a decision to terminate an agency's funding. Correspondingly, the 1994 legislation created a new subsection of the Head Start Act, codified at 42 U.S.C. § 9836a, that required the Secretary, by regulation, to establish performance, administrative, financial, facility and other standards governing Head Start agencies and programs that would set the minimum level of "overall accomplishment" that a Head Start agency needed to meet, and to conduct triennial reviews of existing Head Start programs to determine compliance with the standards promulgated. Under § 9836a(d), if the Secretary determined, pursuant to these reviews, ·that a Head Start agency

failed to meet those standards, the Secretary is obligated to inform the agency of the deficiency, allow the agency, if possible, to submit a Quality Improvement Plan, and initiate termination proceedings if the agency failed to correct the deficiency.

## C. Preference for Existing Head Start Agencies that Maintain Quality

Plaintiff argues that the legislative history of § 9836(c) reflects a strong congressional preference that Head Start programs be administered by agencies that have a long history of providing Head Start services. Pointing to changes in the statutory language (for example, changing the requirement that the Secretary make a finding of program compliance before giving an existing Head Start agency priority in designation to a requirement that the Secretary must give priority to existing Head Start agencies unless he or she makes a finding of program noncompliance) and statements made in congressional reports accompanying the relevant legislation (for example, the 1981 Senate report in which the Committee stated that it did not intend to encourage the proliferation of numerous small grantees), plaintiff argues that HHS' decision to award the grant to Dimock ignores Congress' intent that such grants be awarded to agencies like ABCD.

From an examination of the evolution of § 9836(c), I conclude that this portion of the statute and its legislative history does reveal a manifestation of a congressional intent to afford preference in the designation of Head Start grantees to agencies with a history of providing Head Start services. The language expressing the intent that existing agencies receive priority has remained very nearly the same over the nearly 25 years since its first statutory embodiment. In committee reports accompanying the amendments over the years, legislators have consistently stated that it was the intent of the law's drafters that agencies with experience in providing Head Start services be granted funding preference. Existing Head Start agencies are to be given priority in designation decisions because of a belief on the part· of the legislators that affording such a priority would, in the words of one Com-

mittee report, "promote stability, program[m]atic expertise and administrative competence." S.Rep. No. 97–158, at 12 (1981).

I conclude, however, that the same legislative history and statutory development also manifests an intent on the part of Congress that an existing Head Start agency that fails to meet Head Start standards will not be granted this priority. The statutory and legislative preference that funding be given to agencies with a history of administering Head Start programs has always been qualified by the requirement that the agencies continue to meet standards promulgated by the Secretary. This congressional concern with maintaining the quality of Head Start services has only increased over the past decade, as reflected in the 1994 implementation of 42 U.S.C. § 9836a, requiring the Secretary to set new standards and providing a detailed mechanism by which the Secretary can terminate a program that fails to meet these standards. Although it is true that some of the provisions of § 9836a arose in response to concerns about the quality of new Head Start agencies, the committee reports make it clear that legislators were also concerned about maintaining the quality of existing Head Start agencies.

### D. Determining What Constitutes a Finding of Program Deficiency for Purposes of 42 U.S.C. § 9836(c)

The defendant does not contest plaintiff's argument that ABCD, as the only applicant providing Head Start services in 1981, qualified for the statutory priority in § 9836(c). Moreover, the defendant has not pressed its argument that the provisions of § 9836(c) do not apply to this "replacement grant," an argument which is difficult to square with the terms of § 9836(c)(1), which state that priority applies to all designations of Head Start agencies (to provide new, continuing, or replacement programs), and with the terms of the HHS regulation set forth in 45 C.F.R. § 1302.12, which direct the Secretary to apply the priority, along with considerations governing replacement grants, to all designation decisions. The defendant maintains, however, that Galligan's decision to deny

ABCD the statutory priority because of the program deficiencies identified at the PCC constitutes a reasonable interpretation and application of the statute.

In his May 15, 1997 Declaration, Galligan found that:

> ABCD did not and does not qualify for said priority because of the May 10, 1996 finding that ABCD fails to meet program, financial management, and other requirements established by the Secretary. *See* Administrative Record, volume II, tab 10. . . . The May 10, 1996 letter and attached report, which provided ABCD with "detailed information on all areas in which [its] program was not meeting minimum Head Start standards" based upon a March, 1996 on-site monitoring visit, constitutes such a finding.

The letter to which Galligan refers informed ABCD that ACF had conducted an on-site monitoring review of the agency's PCC program which is described by ACF as a "Head Start program." Attached to the letter was a report of specific findings detailing the areas in which the program "was not meeting minimum Head Start standards." (A.R., Volume II, tab 10 at 1). Although the letter and report noted that the PCC was in compliance with Head Start standards in some areas, ACF stated that it found the ABCD PCC program to have numerous program deficiencies. ACF also cited the PCC with "inadequate agency capacity to plan, and manage the delivery of Head Start services." After summarizing the program deficiencies, ACF administrator Galligan stated:

> In light of the fact that the Parent Child Center submitted a full year application proposing major design changes in efforts to provide a more clinical and individualized family development support that assists parents and families to support and nurture their children as well as achieve their social and economic goals, the aforementioned deficiencies raise serious concerns regarding the agency's capacity to plan, manage and deliver services.

*Id.* The letter informed ABCD that it needed to submit a Quality Improvement Plan in order to remedy the identified deficiencies,

which under the Head Start statute could not remain uncorrected for over one year.

Plaintiff argues that Galligan acted arbitrarily and capriciously in basing his decision to deny ABCD the statutory priority under § 9836(c) on the May 10, 1996 letter regarding deficiencies at the PCC. According to plaintiff, "Congress did not, however, intend that the Secretary would conflate the results of a *program*–specific [on–site review] report with the required § [9836](c) finding of *agency* incompetence, as a review of the Act's structure demonstrates." Plaintiff's Trial Memorandum at 25.

■ In support of its argument, plaintiff points to the statutory language and history of the Head Start Act, and specifically to the interplay between § 9336(c) and § 9836a. First, plaintiff argues that the use of the word "and" in the phrase "program, financial management *and* other requirements established by the Secretary," § 98116(c)(emphasis added), suggests that the legislators intended that the priority should only be denied after the Secretary made a comprehensive finding of deficiency on all of these grounds. Plaintiff has not identified, and the court has not been able to discover, however, any evidence in the legislative debates and reports that helps explain the change from the previous language or that helps determine the meaning of this phrase in terms of the scope of the finding that must be made by the Secretary before denying the priority,

Plaintiff argues that the scope of the required finding is better explained by an examination of the connection between § 9836(c) and the provisions of § 9836a. As noted above, in 1990 Congress added to subsection (c) provisions that required the Secretary to conduct triennial reviews of agencies designated under § 9836 to ensure their compliance with "program and fiscal requirements established by the Secretary," the same language used with regard to denying or applying the designation priority. These provisions required the Secretary to ensure that each designated agency was in compliance with the performance standards in effect under § 651(b) of the Act, governing the evaluation of Head Start programs.

In 1994, Congress deleted the portion of subsection (c) dealing with triennial reviews, repealed the provisions of § 651(b), and enacted § 9836a, stating in much greater detail a framework under which the Secretary was to monitor Head Start agencies and programs. Plaintiff argues that the connection between § 9836(c), which in 1990 contained the original triennial review requirement, and § 9836a (which plaintiff contends represents a combination of the original review requirement and the program performance standards contained in § 651(b)), means that the scope of the finding of agency deficiency under § 9836a is best determined by looking to the provisions of § 9836a.

Section 9836a, entitled "Quality standards; monitoring of Head Start agencies and programs," states that:

(a) **Quality standards**

(1) **Establishment of standards**

The Secretary shall establish by regulation standards applicable to Head Start agencies, programs, and projects under this subchapter, including—

(A) performance standards with respect to services required to be provided, including health, education, parental, involvement, nutritional, social . . . and other services;

(B) administrative and financial management standards;

(C) standards relating to the condition and location of facilities for such agencies, programs, and projects; and

(D) such other standards as the Secretary finds to be appropriate

(2) **Minimum requirements**

The regulations promulgated under this subsection shall establish the minimum level of overall accomplishment that a Head Start agency shall achieve in order to meet the standards specified in paragraph (1).

42 U.S.C. § 9836a(a). Section 9836a also provides for triennial monitoring "to determine whether head Start agencies meet standards established under this subchapter with respect to program, administrative, financial management, and other requirements," 42

U.S.C. § 9836a(c), and sets forth the procedure by which HHS informs an agency of any deficiencies and the steps the agency must take to cure the deficiencies in order to avoid termination of a designation as a Head Start agency.

Plaintiff argues that the creation of § 9836a reflects Congress' intent that the Secretary make a finding of "overall agency incompetence" before the Secretary can take adverse action with regard to funding that agency. Plaintiff suggests that the language in subsection (a)(2)—that the regulations promulgated by the Secretary with regard to the four areas listed in (a)(1) will establish "the minimum level of overall accomplishment that a Head Start agency shall achieve in order to meet the standards specified in paragraph (1)"—means that an agency must fail "overall" before the Secretary may deny the agency priority in designation. Plaintiff argues that because ABCD, as an *agency*, administers 26 Head Start *programs* in the Boston area, ACF's finding of deficiencies in some portions of only one of ABCD's programs (comprising only 4% of ABCD's Head Start funding) cannot reasonably form the basis of a decision that the agency fails to meet "program, financial management and other requirements established by the Secretary"

■ As an initial matter, I note that the statutory directive with regard to the particular circumstances in this case is not crystal clear. There is thus the question regarding what level of deference this court should give to Galligan's interpretation that the findings relating to the PCC was sufficient to constitute a finding for purposes of § 9836(c). In cases involving review of an interpretation of an agency of its own enabling statute, courts engage in a two-tiered analysis:

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its

own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). *See also Visiting Nurse Ass'n of North Shore, Inc. v. Bullen*, 93 F.3d 997, 1001–02 (1st Cir.1996).

■ Galligan did not provide a reasoned explanation for why he concluded that the findings regarding the PCC were sufficient for purposes of denying ABCD the statutory priority under § 9836(c). In these circumstances, where HHS has not promulgated formal rules governing the finding required under § 9836(c) and where Galligan's interpretation is apparently the only official view coming from HHS, the administrative agency's interpretation should not be afforded great deference. *See, e.g., Strickland v. Comm'r, Maine Dep't of Human Servs.*, 96 F.3d 542, 548 ("longstanding agency interpretations generally receive greater deference than newly contrived ones"). I nevertheless conclude that defendant's decision was a reasonable interpretation and application of the statutory language to the facts at issue in this cased.

From my examination of both the language and legislative history of § 9836(c), I conclude that the statute directs the HHS to do the following: (1) afford ABCD priority in the decision by HHS to designate a Head Start agency to administer the grant in question; (2) consider whether it (HHS) determines that ABCD has failed to meet "program, financial management, and other requirements established by the Secretary;" and, if determining failure, (3) assess agency compliance with Head Start standards that are promulgated in accordance with the directive contained in § 9836a.

The extent to which the provisions of § 9836a govern the determination under § 9836(c), however, is not apparent on the face of the statute, or in its legislative back-

drop. The use of similar terms in both sections, and the fact that the first provisions for triennial reviews were set forth under § 9836(c), suggest that a finding under § 983(c) should be based upon the standard established under § 9836a. It seems likely that the previous iterations of § 9836(c), which were enacted well before the advent of § 9836a, implied that an HHS decisionmaker would base his or her determination of whether the agency met Head Start standards on the standards set up by the Secretary under former § 651. Section 9836a(a) provides a more direct link between the sections, in stating that "[t]he Secretary shall establish by regulation standards applicable to Head Start agencies, programs, and projects under this *subchapter*," (emphasis added). In its codified form, the provisions governing Head Start programs form a subchapter under the Chapter covering Community Services Programs.

What is not clear, however, is the extent to which the other provisions of § 9836a pertain to the finding regarding the priority. Subsection 9836a(c) states that "[i]n order to determine whether Head Start agencies meet standards established under this subchapter with respect to program, administrative, financial management, and other requirements, the Secretary shall conduct the following reviews of designated Head Start agencies, and of the Head Start programs operated by such agencies." In fact, Galligan based his decision to deny the priority upon the results from such a monitoring review.

Subsection (d) of § 9836a, however, sets forth the procedures by which a Head Start agency is informed of any deficiencies, given the opportunity to remedy any problems, and finally terminated as a designated Head Start agency if the deficiencies are not corrected. Terminations of funding as a designated agency, along with denials of applications for refunding and suspensions of funding, are actions that may not be taken without "reasonable notice and opportunity for a full and fair hearing." 42 U.S.C. § 9841(a)(3). The distinction between these types of actions, and the action taken in this case (denial of a priority in designating an agency to assume a replacement grant) make it less probable that Congress intended that the procedures to be taken with regard to deficiencies that might lead to termination should be applied to the decision under § 9836(c).

Even if this was the case, it is not clear that, as plaintiff urges, § 9836a requires a much more comprehensive finding of deficiency before HHS can take adverse action with regard to the Head Start agency. Section 9836a(d) describes a situation when the Secretary "determines, on a basis of a review pursuant to subsection (c) of this section, that a Head Start agency designated pursuant to section 9836 of this title fails to meet the standards described in subsection (a) of this section." The statute does not elaborate on the extent of the deficiencies that must occur in order to warrant the Secretary's informing a Head Start agency of problems, but an interpretation that an agency would have to fail in all of the areas listed in § 9836a(a)(1) in order to receive a warning would not make sense. Under this interpretation, a Head Start agency that showed serious sufficiencies in its ability to provide quality services and to administer the program and fiscal aspects of a Head Start program, but that maintained an adequate facility, would not be the target of any corrective action. Moreover, § 9836a(a)(1) also states that the Secretary shall establish "such other standards as the Secretary finds to be appropriate." This language suggests that the Secretary has some level of discretion in determining the scope of the standards that must be met in order to maintain Head Start program quality.

The circumstances of this case, of course, differ from the situation contemplated on the face of § 9836a. As ABCD notes, its PCC program is only one of the 26 Head Start-related programs that ABCD administers in the Boston area, and accounts for only 4% of Head Start funding received by the agency. The May 10, 1996 findings regarding the PCC program might not be sufficient to support the initiation of termination proceedings by HHS. Here, however, when the findings were made at the same time that the defendant was considering the applications for the

grant to replace Esquelita Aquebana, a decision that required the defendant to assess the qualifications for administering a "new" program, it is not unreasonable to expect that the defendant decision-maker would take such negative results into account. The statement by Galligan to ABCD that "the aforementioned deficiencies [at the PCC] raise serious concerns regarding the agency's capacity to plan, manage and deliver services" shows that Galligan was indeed concerned about the ability of ABCD to devise and administer a start-up Head Start program.

Although Galligan did not find that ABCD, as a whole, failed to meet Head Start standards, I conclude that he was not required by the statute to make such a finding. Plaintiff claims that the type of review received by the PCC is a commonplace event for Head Start agencies throughout the country, and that this court's acceptance of the administrative rationale for its decision will render the statutory preference for long-time Head Start providers a "nullity," because every one of these providers will have received such a review regarding at least one of its programs. I conclude, however, that the priority would be rendered an automatic grant award in favor of long-term Head Start agencies if plaintiff's interpretation was accepted. Neither result is compatible with the intentions manifested in the stature. I conclude instead that it was reasonable for Galligan to rely upon a finding of deficiencies at one of the agency's programs to determine that ABCD should not receive a priority in the grant award decision.

### E. Other Challenges to Defendant's Decision

Throughout this litigation, plaintiff has raised a number of other challenges to the decision of the Secretary's delegate to award the grant to Dimock over ABCD. In general, these challenges involve various assertions by plaintiff regarding the relative capability of ABCD and Dimock to provide continuous, comprehensive, and quality Head Start services to the grant recipients. For example, plaintiff challenges defendant's decision to award the grant despite plaintiff's higher

panel review score, to base its decision upon ACF's perception that ABCD was going to cut its enrollees by 160 children (plaintiff argues it was forced to propose these cuts because of "level funding" by HHS for the next fiscal year), and to take into account in its decision the views of the Massachusetts Department of Social Services. In support of its argument that ABCD was the more appropriate agency to receive the grant, plaintiff also points to alleged shortcomings on the part of Dimock that have occurred after Dimock was designated the grantee agency.

■■■ For many of the same reasons stated in Part IV.D, above, I conclude that the Secretary's delegate did not act arbitrarily, capriciously in awarding the grant to Dimock rather than to ABCD. Under the standard of review discussed above, a reviewing court should not substitute its own judgment for that of the administrative decision-maker, as long as the actions of that decision-maker are not so "unreasonable" that the law should not permit them to stand. See, e.g., Sierra Club, 976 F.2d at 769. Where, as here, the administrative decision-maker contemporaneously provided a reasoned explanation for choosing a lower-ranked applicant, and where the reasons for that choice (such as the findings regarding the PCC and ABCD's stated intention to lower enrollment, whatever the motivating force) are not irrational or without factual support, I cannot say that the decision was arbitrary and capricious within the meaning of the standard of judicial review of administrative actions.

Because the decision at issue in this case involves events occurring up to the time of the grant award, I need not address plaintiff's allegations regarding the performance of Dimock since its designation as the grantee agency.

### V.

In its Motion for Injunction Pending Appeal, filed before this court had finally made the decision explained in Parts III–IV above, plaintiff has argued that the court should preserve the status quo by preventing HHS from disbursing more grant funds to Dimock while ABCD pursues its appeal of the court's denial of its motion for interim relief. As the

plaintiff notes in a later filing, the "status quo" has changed from the time plaintiff first moved orally for an injunction pending appeal, due to the fact that on June 13, 1997, the day of the most recent hearing before this court, HHS disbursed grant funds in the amount of $460,000 to Dimock to continue its Head Start program.

Anticipating that this court might make the decision it has made in Parts III–IV, plaintiff has made clear that it presses its motion for injunction pending the outcome of the previous appeal and plaintiff's announced intended appeal from this court's final judgment for defendant.

■■■ Federal Rule of Civil Procedure 62(c) states that:

When an appeal is taken from an interlocutory or final judgment granting, dissolving, or denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party.

The requirements for granting an injunction pending appeal are essentially the same as those for injunctive relief in general: "(1) whether the [injunction] applicant has made a strong showing that he [or she] is likely to succeed on the merits; (2) whether the applicant will be irreparable injured absent a[n injunction]; (3) whether issuance of the [injunction] will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill,* 481 U.S. 770, 776, 107 S.Ct. 2113, 2119, 95 L.Ed.2d 724 (1987). Although plaintiff must show that its case has merits, if the requested injunction would only slightly harm defendant, plaintiff does not have to show an absolute probability of success on appeal. *See Providence Journal v. Federal Bureau of Investigation,* 595 F.2d 889, 890 (1st Cir.1979).

In addition to arguing that it will succeed on the merits of its case, plaintiff contends that the "balance of harms" (encompassed by the last three factors of the applicable standard) weighs in favor of granting ABCD injunctive relief. ABCD argues that irreparable injury can be presumed by "a clear statutory violation resulting from HHS's awarding of the Head Start grant at issue to Dimock," and that ABCD will be irreparably harmed in the future if the injunction is not allowed. Because funding of Dimock, as the designated Head Start agency for the grant, will continue unless and until Dimock is terminated for cause, ABCD argues that it will continue to suffer harm by being foreclosed from this particular source of Head Start funding. Plaintiff's Memorandum in Support of Motion for Injunction Pending Appeal at 16. In contrast, ABCD argues, defendant HHS will "suffer no injury" because, in part, the administrative agency will not bear any monetary loss.

■■■ Plaintiff underestimates the effects on defendant and, more importantly in this case, the deleterious effect on the intended beneficiaries of the grant in controversy, that would occur if the court were to grant its motion for injunction pending appeal. Based on my consideration of plaintiff's arguments in the light of the record before me, I find that plaintiff is not likely to succeed on the merits of its appeal.

Also important to determining the appropriate ruling on plaintiff's motion is the public interest implicated by the type of injunction requested by plaintiff. Dimock is not merely "dissipating" the grant funds, as plaintiff asserts, but is using them to provide Head Start services to the area in question. I do not find the assertions of an employee of ABCD that Dimock is not providing a satisfactory Head Start program a sufficient basis upon which I can find that the "balance of equities" weighs in favor of enjoining Dimock's use of the grant funds, thereby putting an end to any services at all for the intended beneficiaries. If I were to grant plaintiff's requested injunction, the Head Start program administered by Dimock could not operate, as a practical matter, during the pendency of this appeal. Given the circumstances of this case, I cannot find that this would be either an equitable result or an outcome serving the public interest.

## VI. Conclusion

For the foregoing reasons, I conclude that the decision of the Secretary's delegate to award the grant to Dimock, rather than to

ABCD, was not arbitrary and capricious. I conclude, furthermore, that the decision to deny ABCD the statutory priority contained in 42 U.S.C. § 9836(c) was not an unreasonable interpretation and application of the statutory directive. Having found that ABCD is not likely to succeed on the merits of its claims on appeal, and that any harm suffered by the plaintiff's by denial of the injunction is outweighed by the public interest in serving effectively the intended beneficiaries of the Head Start grant at issue in this case, I will not grant plaintiff's request for an injunction pending appeal. For these reasons, I will order judgment in favor of defendants and deny plaintiff's motion under Federal Rule of Civil Procedure 62(c).

The Clerk is directed forthwith to enter Final Judgment accordingly, on a separate document.